UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊

**KEYUE YUAN,**

                                **Plaintiff,**

                -v-                                5:10-CV-1251 (NAM/ATB)

**TOPS MARKET, LLC; THE PENN TRAFFIC COMPANY; OFFICER HOLLENBECK; AND OFFICER HAINES,**

                                **Defendants.**

◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊◊

APPEARANCES:

Keyue Yuan
940 E. State Street
Ithaca, New York 14850
Plaintiff, *pro se*

Dixon & Hamilton LLP
Michael B. Dixon, Esq., of counsel
2350 North Forest Road, Suite 18A
Getzville, New York 14068-1296
Attorney for defendants Tops Market, LLC and
The Penn Traffic Company

Cornell University Office of University Counsel
Nelson E. Roth. Esq., of counsel
Valerie L. Dorn, Esq., of counsel
Wendy E. Tarlow, Esq., of counsel
300 CCC Building
Garden Avenue
Ithaca, New York 14853
Attorney for defendants Officer Hollenbeck and Officer Haines

**Hon. Norman A. Mordue, Senior U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

    This action stems from an incident on October 10, 2010 at a grocery store located on

property owned by Cornell University ("Cornell") in Ithaca, New York. In connection with the incident, store employees called Cornell peace officers, who escorted plaintiff from the store. Two of those officers, defendants Kyle Hollenbeck ("Officer Hollenbeck") and Justin Haines ("Officer Haines"), now move (Dkt. No. 92) for summary judgment dismissing the claims against them in the amended complaint (see Dkt. Nos. 53, 62, 92-3). As explained below, the Court grants the motion and dismisses all claims against Officers Hollenbeck and Haines. It further directs plaintiff and the remaining defendants to address matters affecting whether the Court has federal subject-matter jurisdiction over the remaining claims.

## FACTS

The following facts relevant to the instant motion are admitted or undisputed unless otherwise noted. Cornell is authorized by statute to employ peace officers, who are designated as special deputy sheriffs in Tompkins County. At all relevant times, Officers Hollenbeck and Haines were acting in the capacity of Cornell peace officers performing responsibilities assigned to them by their employer to protect the grounds and property of Cornell as authorized by statute.

On the evening of Sunday, October 10, 2010, plaintiff went grocery shopping with his wife and daughter at a grocery store then owned by Tops Market, LLC located on Cornell property. The family purchased three items: pine nuts, ice cream, and white asparagus. After the purchase, plaintiff examined his receipt and went to the customer service counter to complain that he had been overcharged for the jar of pine nuts. He requested a refund of $2.50. The male manager at the customer service counter asked plaintiff to show another store employee the shelf price for the pine nuts. At his deposition, plaintiff described the inconvenience of walking halfway across the store to show the employee the shelf price to confirm that he had been

overcharged. The male manager then processed plaintiff's refund, and he received $2.50. Plaintiff also received a coupon for $1.00 under the store's accuracy promise: "The price on the shelf tag will be the price you pay at the checkout."

According to plaintiff, after the family drove home, they discovered that the daughter had left the groceries at the store in a shopping cart near the customer service counter, because she thought plaintiff had returned all three items during the refund process. Plaintiff immediately drove back to the store to retrieve his groceries, but was unable to locate the bag of groceries his daughter had left. Ms. Personius ("Personius"), the female manager to whom plaintiff first spoke upon his return to the customer service counter, stated in her written statement: "At this point he was really yelling and throwing his hands all around." She called Michael Kamin ("Kamin"), the night manager, for assistance. According to Personius and Kamin, Kamin was unsuccessful in calming plaintiff, who continued to yell about his missing groceries. Kamin called Cornell police.

In his response (Dkt. No. 99, pages 6-17) to movants' Statement of Material Facts ("SMF") (Dkt. No. 29-2), plaintiff sets forth the following account of his interaction with Personius and Kamin after he returned to the store and before Officers Hollenbeck and Haines arrived:[1]

> Plaintiff approached the service counter and asked the female manager to help him locate the missing bag of groceries, rather reluctantly, because the unfriendly expression on her face.
>
> She told plaintiff: "NO! I can't deal with you".

---

[1] In quoting from the parties' Statements of Material Facts, the Court omits the citations to the record. The Court does not note or correct typographical or other errors in the parties' submissions.

> Nevertheless, there were no other options for plaintiff. Plaintiff explained to her the reason why the bag was left behind in the store; asked to borrow the phone to call home and ask plaintiff's daughter again where she left the bag; and then asked the female manager to help locate the bag.
>
> While she did allow plaintiff to use the phone, the female manager refused providing any help to locate the bag.
>
> The store did have a policy that when paid groceries of a customer were lost in the store, the store will either re-bag the lost groceries or refund the money paid by the customer for the missing groceries.
>
> During the entire process, plaintiff was not "yelling".
>
> Plaintiff had no reason to and did not accuse the female manager "taking the bag of groceries".

Movants' SMF states: "Ms. Personius called the night manager, Mr. Kamin, for assistance and he tried to calm the plaintiff down but plaintiff continued to yell about his missing groceries so Mr. Kamin called Cornell Police to have him escorted out of the store." Plaintiff responds:

> When the male shift manager, the same one who processed the refund to plaintiff earlier, came to the service counter, plaintiff calmly explained the situation to him.
>
> He also refused providing any help locating the missing bag of groceries despite the policy of the store [to re-bag the lost groceries or give a refund].
>
> Plaintiff pointed to the security camera and requested that the male manager should review the recordings of the security camera and found out who took the bag of groceries.
>
> Plaintiff did not yell. The male manager did not need to calm plaintiff down and he did not do so.
>
> The male manager did not make any phone call during the whole conversation with plaintiff. He falsely claimed he did during this period in his written statement.

Plaintiff also states:

> Before the officers came to the store, plaintiff had a long conversation first

> with the female manager then the male manager on seeking their help to find the missing bag.
>
> Somehow, neither of them made connection between the re-shelved bag and the one plaintiff was looking for. Until a female cashier spoke loud and clear that she had re-shelved groceries, then the male manager finally made the connection and "figured out what happened to his items. They were returned to shelf (ice cream) not knowing who left them."

In their SMF, paragraphs 16 and 17, movants write: "Officer Haines was the first to arrive on the scene. He asked plaintiff 'what seems to be the problem?' and then asked plaintiff to show identification." Movants continue:

> Officers Hollenbeck and Withrow arrived at the store several minutes later. The officers' interaction with plaintiff lasted a total of 12 minutes, while they determined what his concerns were and made sure the groceries he had purchased were handed back to him. The three individual officers noted plaintiff's tone of voice during their interactions and that his voice was shaking, and specifically requested that he lower his voice in the store. ... [Plaintiff] also admitted that Officer Haines asked him to lower his voice, explaining "[m]aybe that's my voice. That's my normal voice and if some people just perceive that it's too loud."

Plaintiff's response includes the following:

> ... [T]he male manager made an accusation that plaintiff threatened the female manager, there and then in front of the police officers.
>
> For Officer Haines, Officer Hollenbeck and Officer Withrow, retrieving Plaintiff s bag of groceries was not their concern at all. Plaintiff was interrogated again and again why he threatened the female manager; how many times, in exact number, plaintiff had shopped in Tops store and how many times he had been overcharged.
>
> Plaintiff told the officers repeatedly that he did nothing to threaten the female manager and he came back to the store just to retrieve the bag of paid groceries as already confirmed by the loud statement from the female cashier.
>
> After a employee of the store passed the bag to Officer Haines, and he in turn passed it to plaintiff, the officers did not let plaintiff go, instead, they asked the male manager, "if he wanted Yuan to receive a notice of trespass", as written in Officer Hollenbeck's report.

>Being surrounded by the police officers, plaintiff was under severe emotional stress. All three officers noticed that plaintiff's voice started to shake and wrote this down in their police reports.
>
>However, the officers and their attorneys treated the plaintiff's shaking voice as an offensive "disorderly conduct", not an obvious sign of being under stress.
>
>Throughout the incident, plaintiff used his regular voice, though shaking at times.
>
>Plaintiff used normal conversation voice with the two managers. Officer Haines observed this and wrote in his report: "I could see him talking to the individuals behind the counter". Apparently, he did not hear the talking.
>
>The female cashier, who later spoke loudly that she had re-shelved the paid groceries, apparently did not hear the conversation either. She stood not far from the service counter.
>
>When Officer Haines enter the store, he did not see or hear anyone "yelling and screaming". He needed to be "directed by the staff behind service (checkout) counter" to identify plaintiff. Officer Haines did not identify who was "the staff" in his report and why he had chosen approaching her/him.
>
>When answering Officer Haines' questioning, plaintiff used the same conversation voice. As soon as plaintiff was asked by Haines to use an even quieter voice, plaintiff obliged.

Movants' SMF states at paragraph 18:

>Plaintiff labels a warning he received from Officer Withrow regarding his tone of voice ("I will arrest you if you raise your voice") as a threat, but admits that he was not arrested. Officer Withrow is not a defendant in this action, and plaintiff does not allege that either of the other officers exceeded their authority in any way.

In response, plaintiff writes: "Deny ... the statement: 'plaintiff does not allege that either of the officers exceeded their authorities in anyway'. The statement is not supported by any materials cited."

Plaintiff admits paragraph 19 of movants' SMF, which states: "A cashier overheard the conversation between plaintiff and the officers about the missing groceries and volunteered that

she had restocked the items on the shelves because she did not want the ice cream to melt." Plaintiff adds: "After hearing the cashier, the three officers kept standing in a semi-circle around plaintiff who stood with his back against the service counter."

Paragraph 20 of movants' SMF, states: "While plaintiff talked with the officers, his groceries were retrieved from the shelves; Officer Haines then handed plaintiff a bag containing all of the groceries he had purchased." In response, plaintiff admits paragraph 20, and adds:

> a. None of the officers told plaintiff that his groceries were being retrieved from the shelves.
>
> b. After a employee of the store passed the bag to Officer Haines, and he in turn passed it to plaintiff, the officers still asked the male manager, "if he wanted Yuan to receive a notice of trespass", as written in Officer Hollenbeck's report.

Plaintiff admits paragraphs 21 and 22 of movants' SMF, which state:

> Mr. Kamin and the officers then asked plaintiff to leave the store. The Cornell officers walked with plaintiff to the store exit and watched him to confirm that he got in his car and left the property.
>
> Plaintiff admitted that his sole purpose in returning to the store was to retrieve his previously purchased groceries. He had no reason to remain in the store after Officer Haines handed him the bag of groceries.

Plaintiff also admits the following assertion in movants' SMF: "The only statement plaintiff alleges was made by Officer Hollenbeck during his entire interaction with the officers was on his way to the door of the store, when Officer Hollenbeck suggested that he shop at Wegmans from now on." Plaintiff adds: "For plaintiff, what Officer Hollenbeck said was an unmistakable warning, not a 'suggestion'."

Movants further assert in paragraph 25 of their SMF: "At no point during the 12 minutes they interacted with plaintiff did any of the officers make physical contact with plaintiff; he was

-7-

not held, confined, arrested, handcuffed, or given any legal process such as a ticket or citation."

Plaintiff responds: "From the moment the officers arrived at the store to the moment plaintiff was 'escorted' out of the store, plaintiff was confined the whole time by a semi-circle formed either by the three officers or by the three officers plus the male manager of the store."

In paragraph 26 of their SMF, movants write: "After plaintiff exited the store, he was involved in a loud conversation with a woman in the parking lot. Plaintiff left the parking lot and drove home after he finished his conversation with the woman in the parking lot." Plaintiff acknowledges having a "normal casual conversation" with a woman in the parking lot; he asserts that it was not loud.

Below are excerpts from the transcript of plaintiff's deposition (Dkt. No. 92-4) concerning his interaction with Officers Hollenbeck and Haines.

> Q. And so you said that you were "confined"?
> A. Yes.
> Q. And what did you mean by that?
> A. Because there's four people confining me.
> Q. And where were you when you were being confined?
> A. I was at the counter, the customer service counter.
> Q. Okay. And was that right in front of where the female employee was and the male employee was?
> A. Yes. And then later I was moved to the – where the wall is.
> Q. Okay. And if you're facing the customer service counter, would that wall be to your right or to your left?
> A. Facing customer – I believe it's to my right, yeah.
> Q. And who asked you to move over there?
> A. I think it's one of the officers, yeah.
> Q. And is that because there were other customers that needed to be helped at the customer service desk?
> A. I don't know why they asked me to move there, yeah.
> ***
> Q. Okay. So you were surrounded by the three male police officers?
> A. Yes. Plus the male manager, yeah.
> Q. Okay. Well – and did you have your back to the customer service desk when you were surrounded?

A. Yes. And then back to the wall, yeah.

Q. Okay. And when you were at the customer service desk, how close were those police officers to you?

A. Couple feet away. It's very close, yeah.

Q. And was there one police officer standing in front of you, then two police officers on both sides of you?

A. Yes.

\*\*\*

Q. Within an arms reach?

A. Yeah. One officer is closer than arms reach, yeah.

Q. And the male manager that you are referring to that talked to you, was he standing behind a police officer, to the side of a police officer when he talked to you?

A. Yeah. Together they form a circle. It's not behind officer.

\*\*\*

Q. And when you say that they interrogated you, what did they say to you?

A. Yeah. They ask how long you have been here in Ithaca, and how many times – exactly how many times you shop for those years. Like 17 years. And how many times you are overcharged – exactly how many times you are overcharged.

\*\*\*

Q. Do you agree that a police officer may approach an individual and ask questions without violating that individual's civil rights?

A. Yes. Yeah.

Q. Is that what Officer Haines did when he approached you in the store on October 10, 2010, and asked you to identify yourself?

A. Yes. No, he didn't ask me. He ask me what's going on and I explained to him and –

Q. Are you saying he didn't ask you to identify yourself?

A. He first, "What's going on," and then I – then he asked me to show him the ID, yeah.

Q. And did you show him an ID?

\*\*\*

A. A driver license, yeah.

Q. And did you hand it to him?

A. Yes. He asked for it, yeah.

\*\*\*

Q. So he didn't hold onto your license. He gave it back to you; correct?

A. Yes. Yeah, yeah.

\*\*\*

Q. You told Officer Haines that you were there to retrieve your groceries and Officer Withrow cut off any response by Officer Haines?

A. Yeah. He cut off – he stepped forward, cut off the conversation and said, "I will arrest you if you raise your voice." And, yeah, that's the conversation

stopped between me and Officer Haines, yeah.
\*\*\*

Q. Okay. And is that because you had raised your voice prior to him telling you that?

A. I don't believe I raised my voice. This is my normal voice. If you say this is raised voice, I mean, that's the voice. He perceive I raise my voice, I didn't raise my voice, yeah.
\*\*\*

Q. Okay. And what did you say to him when he told you that?

A. I didn't say anything. I just – and at the same time he also step very close to me and I step back basically, yeah.
\*\*\*

Q. And at what point in time did the cashier say, "I put those groceries away so the ice cream didn't melt"?

A. After Officer Withrow said, "I'll arrest you."

Q. Okay. He didn't arrest you, did he?

A. Well, I was – define, "arrest." What constitutes as arrest here?

Q. He didn't tell you, "You are under arrest," did he?

A. No. He said, "I will arrest you if you raise your voice."

Q. But he did not place you under arrest; correct?

A. He didn't say, "You're arrested," no.
\*\*\*

Q. And in any event, at some point you were given the ice cream, the pine nuts and the white asparagus; correct?

A. Yes.

Q. So you left store with the items that you had originally purchased?

A. Yes.
\*\*\*

Q. Did you have any other mission in the store other than to retrieve your groceries?

A. That's my only mission, yes.
\*\*\*

Q. Who handed the groceries back to you that you had previously paid for?

A. I believe it's Officer Haines, yeah.
\*\*\*

Q. Okay. Now, after Officer Haines handed back your groceries, did you leave at that point?

A. Yes. I was escorted by the two police officers out of the store.

Q. And when you say "escorted," what do you mean by that?

A. It's not I want to leave. It's I have to leave.

Q. Okay. They didn't hold you by your arms, did they?

A. No, no, no.

Q. And at no time did anybody from P&C quote "touch" you at any time; is that correct?

-10-

A. No, because I don't give them any reason for that, yeah.
\*\*\*

Q. From the time that the grocery bag was handed to you to the time that you got to the door of the store, do you know how much time elapsed?

A. The bag – basically, the bag – they handed me the bag, and then I was escorted to the front – the door. Yeah. It's, yeah – it's...

Q. Was it immediate?

A. Yeah. ...
\*\*\*

Q. Okay. ... You keep saying the "police detained you."

A. Yes.

Q. Your purpose in going back to the store was to get those groceries that you had left behind.

A. Exactly. Yeah.

Q. And when you had those groceries in your hand, did you leave the store?

A. I was escorted by two police officers to the front door.

Q. Did you leave the store?

A. I left the store, yeah.
\*\*\*

Q. Did the police have their hands on you?

A. No. There's no physical contact.

Q. And you were not in handcuffs. You already said that .....

A. Okay. ...
\*\*\*

Q. You were on your own two feet; correct?

A. I was escorted by two police officers out of store and seeking permission to go to my car.

Q. Did anyone tell you you needed to seek permission?

A. Well, I tell myself I better do that.

Q. Did any one of the officers tell you that you needed permission to leave the store?

A. No.
\*\*\*

Q. So you did leave the store. And I asked you to describe for me what you mean by being escorted out of the store. Describe for me exactly what happened.

A. The two officers followed me all the way to the store – to the front, and then I asked them permission to go to my car. ...
\*\*\*

Q. Okay. And when you went out into the parking lot, did you go directly to your car?

A. Yes. I walk towards my car, yeah.
\*\*\*

Q. And did you have a conversation with anybody in the parking lot?

-11-

> A. Yes. With, I believe, a female customer, yeah.
> ***
> Q. And did the video that you reviewed from inside the store and in front of the customer service desk accurately reflect what took place that evening?
> A. About – yeah....

The Court has reviewed the security video showing events at the customer service counter. It depicts the entire incident occurring at the customer service counter. There is no audio. Plaintiff is seen approaching the counter, speaking with the customer service representatives, and using the telephone. He then speaks to the customer service representatives again, gesturing. After a few minutes the officers arrive. They speak with plaintiff, who hands one of them what appears to be his driver's license, which is returned to him, and later hands one of them what appears to be his receipt. The group moves to a wall a few feet to the right of the customer service desk, apparently to allow another customer to speak to a customer service representative. Throughout the incident, the officers stand no closer than normal conversational distance from plaintiff. Eventually someone hands one of the officers a light-colored plastic grocery bag that appears to contain a few items. The officer hands it to plaintiff. After a brief discussion, plaintiff walks away with his bag, followed by the officers.

A second video, also with no audio, shows the sidewalk and parking lot immediately outside the store. Plaintiff, carrying the plastic grocery bag, walks out of the store, followed by two officers. He crosses the crosswalk and walks into the parking lot. The officers stand on the sidewalk, watching plaintiff and evidently waiting until plaintiff enters his car and departs. After a time, they leave.

## COMPLAINT

By Memorandum-Decision and Order (Dkt. No. 62), this Court dismissed Cornell as a

defendant and directed the Clerk of the Court to amend the caption to include Officers Hollenbeck, Haines, and Withrow as defendants. Plaintiff has abandoned his claim against Withrow. The causes of action in the amended complaint (Dkt. Nos. 53, 62, 92-3) that pertain to Officers Hollenbeck and Haines are the first and second causes of action, as follows:

> FIRST CAUSE OF ACTION
> a. The Police Department of Cornell University illegally detained me and deprived my personal freedom to "protect" the property of Cornell University.
> b. The Police Depanment of Cornell University conducted illegal surveillance on my wife, my daughter, and me by using the security camera recordings from the store, and sending a patrol vehicle to my house.
>
> SECOND CAUSE OF ACTION
> c. The Police Department of Cornell University deliberately misrepresented wide range of crucial evidences apparently with means of altering, deleting, or even falsifying police records, police reports, and original video surveillance and audio recordings.

The other three causes of action – for defamation, emotional distress, and discrimination – are asserted only against the store. Plaintiff seeks money damages.

**APPLICABLE LAW**

The party moving for summary judgment must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the burden shifts to the non-movant to adduce evidence establishing the existence of an issue of material fact. *See Linares v. McLaughlin*, 423 Fed.Appx. 84, 86 (2d Cir. 2011). If the non-movant fails to make such a showing, the movant is entitled to summary judgment. When deciding a summary judgment motion, the court must "resolve all ambiguities and draw all factual inferences in favor of the party opposing the motion." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citation omitted). Conclusory statements or mere allegations, however, are not

sufficient to defeat a summary judgment motion.  *Id.*  Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Where, as here, the nonmovant is proceeding *pro se*, the court must read that party's papers liberally and interpret them "to raise the strongest arguments that they suggest."  *Id.* (citation omitted). *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999).

A Fourth Amendment seizure occurs when an officer restrains the liberty of a citizen.  *See United States v. Mendenhall*, 446 U.S. 544, 552 (1980).  The elements of a seizure are: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged."  *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003) (citation omitted).[2] When an officer "even briefly detains an individual and restrains that person's right to walk away, he has effected a seizure and the limitations of the Fourth Amendment become applicable."  *Posr v. Doherty*, 944 F.2d 91, 97 (2d Cir. 1991) (citation omitted).  No seizure has occurred if "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter."  *United States v. Drayton*, 536 U.S. 194, 202 (2002) (quoting *Florida v. Bostick*, 501 U.S. 429, 436 (1991)).  "[T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business."  *Bostick*, 501 U.S. at 437 (citation and quotation marks omitted).  Factors that can turn a consensual exchange of

---

[2] Presumably, plaintiff also intended to state a claim for false arrest under New York State law. Except for the additional requirement that the federal constitutional tort be under color of state law, the elements of a Fourth Amendment seizure claim under 42 U.S.C. § 1983 are substantially the same as the elements of a state law claim for false arrest.  *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).

-14-

information between a police officer and civilian into a Fourth Amendment seizure include the following:

> [T]he threatening presence of several officers; the display of a weapon; physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room.

*United States v. Hooper*, 935 F.2d 484, 491 (2d Cir. 1991) (quotation omitted); *accord United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992) (finding initial stage of encounter was consensual where officer approached defendant in a public place, identified himself as police officer, and, in a non-threatening manner, asked defendant questions, requested identification, and asked whether plaintiff would consent to have his bags searched; no weapons were displayed, and there was no physical contact between the officers and defendant). A police officer does not effectuate a seizure when he "simply requests that a citizen move in order 'to secure a safe and convenient place to talk.'" *United States v. Wiggan*, 530 F. App'x 51, 54 (2d Cir. 2013) *cert. denied*, 134 S. Ct. 1565 (2014) (quoting *United States v. Springer*, 946 F.2d 1012, 1017 (2d Cir. 1991)).

## DISCUSSION

The undisputed facts in the instant case – viewed in the light most favorable to plaintiff as nonmovant – are established by plaintiff's deposition testimony and his response to defendants' Statement of Material Facts, considered in conjunction with the two videos. These facts compel the conclusion that the entire encounter between plaintiff and Officers Hollenbeck and Haines was consensual and that no seizure occurred. Although there were three officers present during much of the incident there is no evidence that the officers detained or confined plaintiff or

interfered with his ability to walk away at any time. Plaintiff does not allege that anyone threatened to use physical force to restrain him.[3] He does not claim that any officer touched him or displayed a weapon; indeed, any such action would have been seen on the video. Plaintiff's testimony and the video establish that plaintiff spoke with the officers, explained the situation, and showed them his identification – which was returned promptly – and the store receipt. "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Bostick*, 501 U.S. at 434. The fact that there was some delay while store personnel ascertained what had happened to plaintiff's groceries and then retrieved them does not transform plaintiff's interaction with the officers into a Fourth Amendment seizure. Likewise, the fact that at one point the group moved away from the customer service counter to the adjacent wall – even assuming that this move occurred at the request of an officer – does not aid plaintiff in proving he was seized. *See Wiggan*, 530 F. App'x at 54. When the bag of groceries was handed to plaintiff, he walked out of the store. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *See Bostick*, 501 U.S. at 434, *quoting Terry v. Ohio*, 392 U.S. 1, 19, n.16 (1968). No such restraint occurred here. Plaintiff's conclusory assertions that he was "confined" and "detained" are wholly lacking in evidentiary support and do not raise a question of fact. Based on the undisputed facts, no reasonable person in plaintiff's position would have believed that he was not free to leave. No rational jury could find that Officers Hollenbeck and Haines seized plaintiff at any point during the encounter.

---

[3] Indeed, the only "threat" claimed by plaintiff was non-party Officer Withrow's alleged statement that he would arrest plaintiff if he raised his voice. Even accepting the truth of this improbable allegation, it does not support a finding that Officer Withrow or anyone else restrained plaintiff's liberty.

Plaintiffs remaining claims against Officers Hollenbeck and Haines lack merit. There is no evidentiary support for his claims that defendants conducted illegal surveillance on his family or that any videos, police reports, or other records were altered, deleted, or falsified. Therefore, all claims against defendants Officers Hollenbeck and Haines are dismissed.

## SUBJECT-MATTER JURISDICTION OVER REMAINING CLAIMS

"[F]ailure of subject matter jurisdiction is not waivable and may be raised at any time by a party or by the court *sua sponte*." *Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 700-01 (2d Cir. 2000). Plaintiff's Fourth Amendment claim against Officers Hollenbeck and Haines under 42 U.S.C. § 1983 clearly gave rise to federal-question subject-matter jurisdiction. Having dismissed that claim, the Court again examines its subject-matter jurisdiction.

The remaining claims in the amended complaint (Dkt. No. 53) are asserted against Tops Market, LLC and The Penn Traffic Company (collectively, "Tops"). They are as follows:

> THIRD CAUSE OF ACTION
> d. The two managers of defendant Tops Market deliberately caused me severe emotional stress, for I was detained in a circle of police officers and a manager of the store for extended period of time for no apparent reason.
> e. The employees of defendant Tops Market, LLP took great pleasure from my emotional stresses.
> FOURTH CAUSE OF ACTION
> f. I was defamed maliciously by the two managers of defendant Tops Market. Since the store is a neighborhood shopping place, I was humiliated and treated as a caught shoplifter in front of my neighbors and the parents of my daughter's classmates.
> FIFTH CAUSE OF ACTION
> g. I was discriminated by the two managers of defendant Tops Market, LLP based on my national origin. They ignored the store policies posted on the wall, and treated me in a completely different way how they treated White customers, as clearly recorded in the video of the store.

There are two possible grounds for federal subject-matter jurisdiction over these claims: federal-

question jurisdiction under 28 U.S.C. § 1331, and diversity jurisdiction under 28 U.S.C. § 1332.[4]

The Court first considers federal-question jurisdiction. The third and fourth causes of action, asserted solely against Tops, are for intentional infliction of emotional distress and defamation, both of which are state law claims. There is no basis for a claim against Tops under 42 U.S.C. § 1983, because there is no basis to find that Tops was acting under color of state law. The only claim against Tops that could "aris[e] under the Constitution, laws, or treaties of the United States[,]" 28 U.S.C. § 1331, and thus give rise to federal-question subject-matter jurisdiction, is the fifth cause of action, claiming discrimination by Tops based on plaintiff's national origin. Plaintiff's allegations in connection with this claim – read liberally and interpreted to raise the strongest arguments that they suggest – may be read as asserting a cause of action for discrimination in a place of public accommodation under 42 U.S.C. § 2000a. Plaintiff in the instant action does not, however, expressly seek injunctive relief, which is the only relief available to an aggrieved individual under this statute. *See* 42 U.S.C. § 2000a-3(a); *Whitehurst v. 230 Fifth, Inc.*, 2011 WL 3163495, *8 (S.D.N.Y. July 26, 2011). Moreover, plaintiff does not allege that, at least 30 days before bringing this action, he gave "written notice of [the] alleged [discriminatory] act or practice ... to the appropriate State or local authority[,]" 42 U.S.C. § 2000a–3(c), *i.e.*, the New York State Division of Human Rights. *See* N.Y. Exec. Law § 293; *Whitehurst*, 2011 WL 3163495 at *8-*9. Accordingly, the Court questions whether plaintiff possesses a meritorious cause of action under 42 U.S.C. § 2000a-3, the only possible remaining federal cause of action. The Court is unable to discern any other federal statutory or

---

[4] Of course, in the event that it dismisses all claims over which it has original jurisdiction, the Court may in its discretion continue to exercise supplemental jurisdiction over state law claims in the same action. *See* 28 U.S.C. § 1367; *Ward v. National Geographic Soc.*, 284 Fed.Appx. 822, 823 (2d Cir. 2008).

constitutional claim that plaintiff could be asserting against Tops. If plaintiff intends to assert any other federal claim against Tops, he should so inform the Court. Plaintiff and Tops are directed to submit briefing on or before October 30, 2015 regarding whether plaintiff states a federal statutory or constitutional claim against Tops.

Even if plaintiff does not assert any federal statutory or constitutional claim against Tops, diversity jurisdiction may exist under 28 U.S.C. § 1332(a)(1). It appears, however, that defendant Tops Market, LLC may be headquartered in New York State. On or before October 30, 2015, Tops is directed to address the issue of whether Tops Market, LLC and/or The Penn Traffic Company are citizens of New York State for diversity purposes.

It is therefore

ORDERED that the motion for summary judgment (Dkt. No. 92) by Officers Hollenbeck and Haines is granted; and it is further

ORDERED that all claims against them are dismissed; and it is further

ORDERED that plaintiff and the remaining defendants, Tops Market, LLC and The Penn Traffic Company, are directed to submit briefing on or before October 30, 2015 regarding whether plaintiff has a cause of action under 42 U.S.C. § 2000a or any other federal statute or constitutional provision; and it is further

ORDERED that Tops Market, LLC and The Penn Traffic Company are directed to submit papers on or before October 30, 2015, addressing whether they are citizens of New York State for diversity purposes; and it is further

ORDERED that the Clerk of the Court is directed to serve copies of this Memorandum-Decision and Order on plaintiff by certified mail, return receipt requested.

IT IS SO ORDERED.

Date:  October 6, 2015
          Syracuse, New York

*Norman A. Mordue*
Norman A. Mordue
Senior U.S. District Judge